## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| SHELLER FARMS, LLC,<br>   on behalf of itself and all other similarly<br>   situated persons and entities,<br><br>               Plaintiff,<br><br>  -vs.-<br><br>SYNGENTA CROP PROTECTION, AG,<br>SYNGENTA CROP PROTECTION, LLC,<br>SYNGENTA CORP., CORTEVA, INC., BASF<br>SE; BASF CORPORATION, BASF<br>AGRICULTURAL PRODUCTS GROUP,<br>NUTRIEN AG SOLUTIONS, INC., HELENA<br>AGRI-ENTERPRISES, LLC,<br>And DOE CO-CONSPIRATOR<br>DISTRIBUTORS AND RETAILERS<br>1-100,<br><br>              Defendants. | CASE NO.:   1:23-cv-202-<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff Sheller Farms, LLC ("Plaintiff") brings this action on behalf of itself and all other similarly situated persons and entities against (1) Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC (collectively, "Syngenta"), BASFSE, BASF Corporation and BASF Agricultural Products Group (collectively "BASF"), and Corteva, Inc. ("Corteva") (referred to herein collectively as the "Manufacturer Defendants"); (2) Co-conspirator Distributor Defendants Nutrien AG Solutions, Inc.( "Nutrien"); and Helena Agri-Enterprises, LLC. ("Helena") (collectively, "Distributor Manufacturer Defendants"); (3) Doe Defendant Co-conspirator Distributors (referred to, together with the Distributor Manufacturer Defendants, as the "Co-conspirator Distributors"); and (4) retailers that participate in loyalty programs described herein ("Retailers") (all of these entities together, including their unnamed co-conspirators, are referred to

collectively as Defendants), and alleges the following:

**NATURE OF THE ACTION**

1.      This is a class action for violations of United States antitrust laws. Manufacturer Defendants produce several crop protection products ("CPPs;" specifically, herbicides, insecticides, and fungicides) used by numerous American farmers, including Plaintiff. Manufacturer Defendants' CPPs, and the active ingredients contained in them, enjoy a period of patent protection and regulatory protection under which they are lawfully protected from competition. Once these protection periods expire, competing generic manufacturers are allowed to produce their own versions of the CPPs, which typically reduce the price of the CPPs significantly.

2.      Here, to maintain their market dominance after their patent and regulatory protection of their CPPs expired, Manufacturer Defendants, from January 1, 2017 to the present (the "Relevant Period" or "Class Period") have used (and continue to use) restrictive agreements disguised as "loyalty programs" with the Co-Conspirator Distributors to block the availability of CPPs to farmers containing lower-priced generic versions of the following active ingredients ("AIs"): Syngenta's MESOTRIONE, AZOXYSTROBIN, and METOLACHLOR, and  Corteva's OXAMYL,  RIMSULFURON,  and  ACETOCHLOR (collectively, the "Relevant AIs").

3.      Under these loyalty programs, the Manufacturer Defendants made substantial payments to Co-Conspirator Distributors, in exchange for the Co-Conspirator Distributors' agreement to strictly limit their purchases of—and thereby prevent widespread distribution of—generic versions of the Manufacturer Defendants' CPPs containing the Relevant AIs, ensuring that the Manufacturer Defendants' far more expensive CPPs would be the vast majority of what the Co-Conspirator Distributors purchased and sold to their customers.

4.      Since a small number of Co-Conspirator Distributors control a very large share of

the CPP sales to retailers that, in turn, sell the CPPs to farmers, and since some of the Co-Conspirator Distributors also own their own retail outlets, when there is a loyalty program in effect for a certain CPP manufactured by Manufacturer Defendants containing the Relevant AIs, the generic CPP manufacturers are foreclosed from nearly all the retail market for such CPP. When there is a loyalty program in place for a particular CPP manufactured by Manufacturer Defendants containing the Relevant AIs, the generic CPP manufacturers can typically only sell much smaller volumes of such CPP, or often cannot sell it profitably at all—forcing them to exit the market or refrain from entering the market in the first place. The Co-Conspirator Distributors participated in these loyalty programs.

5.    The Manufacturer Defendants' loyalty programs have negatively impacted the CPP market in the following ways (and continue to do so): (i) Manufacturer Defendants are able to maintain a near-monopoly for the sales of each of their CPPs containing the Relevant AIs even though patent and regulatory protection have expired and there should be open competition from generic CPP manufacturers, (ii) Manufacturer Defendants are able to continue to charge much higher prices for their CPPs containing the Relevant AIs as a result of excluding most generic competition, generating supra-competitive profits, (iii) Manufacturer Defendants share a portion of their supra-competitive profits with their Co-conspirators Distributors to ensure their cooperation with this scheme, (iv) farmers pay much higher prices for CPPs containing the Relevant AIs than they otherwise would pay if there was free and open competition but for Defendants' wrongful conduct, and (v) generic CPPs containing the Relevant AIs are also priced higher than they would be priced if there was free and open competition but for Defendants' wrongful conduct.

6.    Defendants' anticompetitive scheme has reduced competition in the market for the CPPs containing the Relevant AIs, thereby artificially inflating the prices of such CPPs and of the CPPs manufactured by Manufacturer Defendants' generic competitors. Plaintiff and the Class

member farmers who purchased CPPs containing the Relevant AIs have been (and continue to be) injured by paying artificially inflated prices for such CPPs—for which they are entitled to compensation.

7.    Plaintiff, on behalf of itself and Class members, seeks treble damages and injunctive relief, demanding a trial by jury of all issues so triable, under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1-2), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26).

## JURISDICTION AND VENUE

8.    Plaintiff, on behalf of itself and Class members, brings this action under Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to secure damages for Defendants' violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2, and recover treble damages, injunctive relief, litigation expenses, costs of suit, and reasonable attorneys' fees for Plaintiff's and Class members' injuries, harm, and damages directly and/or proximately resulting from Defendants' above-described wrongful conduct.

9.    This Court has subject matter jurisdiction over Plaintiff's and Class members' claims under 28 U.S.C. §§ 1331 and 1337(a), and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

10.    This Court has personal jurisdiction over each Defendant because each Defendant, throughout the United States, including in this District and the State of Indiana, transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the above-described illegal scheme and conspiracy (and continues to do so). The alleged scheme and conspiracy were directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, and/or doing business throughout the United States, including this District and the State of Indiana.

11.    Defendants' and co-conspirators' above-described wrongful actions were (and

continue to be) within the intended flow of commerce within the United States and had direct, substantial, and reasonably foreseeable effects on interstate commerce.

12.    Venue is proper in the Southern District of Indiana under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. §§ 1391(b); (c); and (d), because during the Relevant Period, one or more Manufacturer Defendants resided, transacted business, were found, or had agents in the Southern District of Indiana (and continue to do so), and a substantial portion of Defendants' alleged wrongful actions affecting interstate trade and commerce was carried out in this District.

13.    Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and/or the Indiana long-arm statute because (i) each Defendant transacts and/or transacted business in Indiana, (ii) the Indiana long-arm statute extends jurisdiction to the limits of Due Process, and (iii) each Defendant has sufficient minimum contacts with the state of Indiana to satisfy Due Process.

## **PARTIES**

14.    Plaintiff Sheller Farms, LLC is a limited liability company organized under the laws of Indiana.  Plaintiff Sheller Farms, LLC owns and operates a crop and livestock farm in Indiana. Plaintiff Sheller Farms, LLC directly purchased CPPs containing one or more of the Relevant AIs from Nutrien and/or its affiliates or agents during the Relevant Period, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of Defendants' above-described wrongful actions.

15.    Defendant Syngenta Crop Protection AG is a Swiss public limited company based in Basel, Switzerland with its North American headquarters in Greensboro, North Carolina.

16.    Defendant Syngenta Crop Protection, LLC, an affiliate of Defendant Syngenta Crop Protection AG, is a Delaware limited liability company based in Greensboro, North Carolina.

17.     Defendant Syngenta Corp., an affiliate of Defendant Syngenta Crop Protection AG, is a Delaware corporation based in Wilmington, Delaware.

18.     Defendant Corteva, Inc. is a Delaware corporation based in Indianapolis, Indiana. Defendant Corteva, Inc. was formed in 2017 when Dow Chemical and DuPont merged to form DowDuPont. In 2019, DowDuPont spun off its agricultural business, including CPP manufacturing, into Defendant Corteva, Inc.

19.     Defendant BASF SE is a multinational global chemical company headquartered in Ludwigshafen, Germany. It is the largest chemical producer in the world. It transacts business in this Judicial District through its subsidiaries and divisions.

20.     Defendant BASF Corporation, headquartered at 100 Park Avenue, Florham Park, New Jersey 07932, is the North American affiliate of BASF SE.

21.     Defendant BASF Agricultural Products Group is a division of BASF SE and is headquartered at 14385 West Port Arthur Road, Beaumont, Texas. It transacts or has transacted business in this Judicial District.

22.     Defendant Nutrien is a national wholesale distributor and retailer of crop protection products, including some or all the products at-issue in this action, with its corporate offices located in Loveland, Colorado. Nutrien transacts or has transacted business in this Judicial District. Nutrien is a corporation organized and existing under the laws of the State of Delaware.

23.     Defendant Helena describes itself as one of the nation's foremost agricultural distributors. It is headquartered in Collierville, Tennessee, and among other things, it distributes crop protection products, including some or all of the products at-issue in this action. Helena transacts or has transacted business in this Judicial District. Helena is a corporation organized and existing under the laws of the State of Delaware.

24.     Other unknown persons, firms, corporations, and/or other entities not named as

Defendants in this Complaint participated as co-conspirators and performed acts and made statements in furtherance of Defendants' above-described anticompetitive conduct, including entering into the above-described anticompetitive "loyalty programs." Defendants are jointly and severally liable for the acts of their co-conspirators, regardless of whether Plaintiff formally names such co-conspirators as Defendants.

## INTERSTATE COMMERCE

25.    The market for CPPs in the United States is a national market.

26.    Manufacturer Defendants Corteva and Syngenta sell their CPPs to distributors, which sell them to retailers, which sell them to farmers in all 50 states.

27.    Defendants' manufacture, distribution, and sale of CPPs involves a continuous and uninterrupted flow of commerce across state lines.

28.    Defendants' anticompetitive actions have had (and continue to have) a substantial effect on interstate trade and commerce in the markets for the CPPs containing the Relevant AIs.

## THE CPP INDUSTRY BACKGROUND

**A.    Introduction.**

29.    The CPPs containing the Relevant AIs fall into three categories: herbicides, insecticides, and fungicides.

30.    Herbicides (also known as weedkillers) are chemicals used to control weeds. Selective herbicides control specific weed species, while leaving the desired crop relatively unharmed. Non-selective herbicides (sometimes called total weedkillers in commercial products), on the other hand, are used to clear waste ground as they kill all plant material with which they come into contact.

31.    Insecticides (also known as pesticides) are chemicals used to kill or control various unwanted species of pests that reduce crop yields. Most of the pesticides used in the United States are

used by farmers to protect their crops.

32.     Fungicides are biocidal chemical compounds or biological organisms used to kill parasitic fungi or their spores. A fungistatic inhibits their growth. Fungi can cause serious damage in agriculture, resulting in critical losses of yield, quality, and profit. Chemicals used to control oomycetes, which are not fungi, are also referred to as fungicides, as oomycetes use the same mechanisms as fungi to infect plants. Fungicides can either be contact, translaminar, or systemic. Contact fungicides are not taken up into the plant tissue and protect only the plant where the spray is deposited. Translaminar fungicides redistribute the fungicide from the upper, sprayed leaf surface to the lower, unsprayed surface. Systemic fungicides are taken up and redistributed through the xylem vessels. Most fungicides are sold in liquid form.

33.     Weeds compete with crops for water, soil nutrients, and sunlight. Pests, such as insects or roundworms (known by the scientific name "nematodes"), eat the plants, and the plants also can be infected by fungi. Any of these crop afflictions can kill or reduce the growth of crops and reduce their yields.

34.     Herbicides, insecticides, and fungicides target these unwanted species to protect crops. Ergo, they are known as "Crop Protection Products" (CPPs).

35.     CPPs contain (i) one or more active ingredients—such as the Relevant AIs—which are the chemical(s) that actually eradicate the targeted weeds, pests, or fungi, and (ii) various inactive ingredients, such as water, surfactants (a chemical that helps a liquid spread more easily to increase its effectiveness), or adjuvants (which slow the drying of a liquid or improve its absorption into plant leaves).

36.     AIs differ from one another in various ways: (i) the type of weeds, pests, and fungi they target, (ii) their effectiveness in eliminating or controlling the targeted weeds, pests, and fungi, (iii) the type of crops for which they are used, (iv) the stage of the growing cycle in which they are

8

used, and (v) how well they function under different climactic and weather conditions.

37.     The way in which a specific AI kills or controls unwanted weeds, pests, or fungi is known as a "mode of action." Different AIs have different modes of action in terms of the chemical and biological reactions they use on the targeted weeds, pests, or fungi. For this reason, a generic version of a brand-name CPP that has the same AIs is normally a suitable substitute for the corresponding brand-name CPP.

38.     The CPPs at issue here are Syngenta's CPPs containing the Relevant AIs MESOTRIONE, AZOXYSTROBIN, and METOLACHLOR and their generic equivalents, and Corteva's CPPs containing the Relevant AIs OXAMYL, RIMSULFURON, and ACETOCHLOR and their generic equivalents.

## B.     CPP Manufacturers.

39.     Companies that manufacture CPPs can either manufacture the AIs internally or buy the AIs from chemical suppliers.

40.     Companies that perform their own research and development of AIs for CPPs are known as basic manufacturers. Basic manufacturers secure patent protection for the AIs they develop.

41.     Manufacturer Defendants Syngenta and Corteva are basic manufacturers, and among the largest CPP manufacturers in the United States.

42.     Generic manufacturers of CPPs typically do not engage in their own research and development of AIs. They primarily sell CPPs using AIs developed by basic manufacturers for which the patent and regulatory protections have expired. There are more than twelve generic manufacturers selling CPPs in the United States.

## C.     Government Regulation of CPPs.

43.     The federal government uses regulation and the patent system to encourage CPP

manufacturing in two distinct ways: (i) rewarding basic manufacturers, such as Syngenta and Corteva, for researching and developing new CPP AIs by giving them a period of patent and regulatory exclusivity, and (ii) once the protection periods expire, encouraging generic manufacturers to make much cheaper versions of the CPPs. This system allows for a period of large profits for basic manufacturers for researching and developing new brand-name CPP AIs that, in turn, encourages continued innovation, but also makes CPPs affordable once the protection periods expire.

44.    Patent protection for a basic manufacturer developing a new CPP AI lasts from the date of issuance of the patent until twenty years after the date of the patent application.

45.    The Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) is a federal regulatory scheme that also rewards innovation while guaranteeing the safety of CPPs. To sell or distribute a CPP in the United States, a manufacturer must conduct research about the CPP's toxicity and environmental impact, and then submit that information to the Environmental Protection Agency (EPA), which reviews that information prior to approving that CPP.

46.    When the EPA approves a new CPP AI, the basic manufacturer that applied for approval of the new AI has a ten-year period under which other companies are not allowed to rely on the studies and data it submitted. The effect of this protection is the basic manufacturer obtaining the approval has a ten-year exclusive period that can (and often does) last after the expiration of the patent.

47.    After both the patent protection and FIFRA ten-year period protection of an AI have expired, a generic manufacturer may secure approval to enter the market by using the same data the basic manufacturer originally submitted. This is a much faster, easier, and cheaper process than a company performing its own research and development.

   D.    **The CPP Distribution Channel.**

48.     CPP manufacturers sell their CPPs to distributors.

49.     CPP distributors sell CPPs to farmers through their own retail outlets and/or sell CPPs to retail chains and independent retailers in farming communities around the country that, in turn, sell the CPPs to farmers.

50.     This "traditional" distribution channel is responsible for approximately 90% of all CPP sales in the United States.

51.     The seven largest U.S. CPP distributors— Nutrien Ag Solutions, Helena Agri-Enterprises, GROWMARK, Inc., Wilbur-Ellis Co., CHS, Pinnacle Agriculture Distribution, and Simplot Grower Solutions—sell approximately 90% of all CPPs sold in the United States through the traditional distribution channel, which equates to about 80% of the total sales of CPPs in the United States annually.

52.     The distributors are the best way for a CPP manufacturer to reach their farmer target market.  A CPP manufacturer must only sell through a few large distributors to access a large percentage of all retail outlets serving most American farmers. The distributors either own their own retail stores or have longstanding relationships with retailers that facilitate their CPP sales. Distributors also have a massive infrastructure to support the distribution and sales of their CPPs, including logistics, storage facilities, financing, and promotions. CPP manufacturers would encounter substantial difficulties and significant costs trying to develop these logistical capabilities on their own; it also would be far less efficient for CPP manufacturers to try to sell CPPs directly to retailers or farmers.

   **E.    Generic Entry and Life Cycle Management.**

53.     Once the patent and regulatory exclusivity for a basic manufacturer's branded CPP expire, market entry of generic versions of the CPP is normally associated with active competition between many manufacturers, which, in turn, results in far lower prices and vastly reduces the profit

the basic manufacturer makes from the CPP.

54.    Basic manufacturers, such as Syngenta and Corteva, engage in corporate strategy planning, known as "life cycle management," for a branded CPP.  This can be done in a perfectly legal and pro-competitive manner, such as determining how a CPP's pricing should change, and how much in promotional expenses should be devoted to that CPP, at different points in its exclusivity period.  However, it can also involve anticompetitive methods designed to prevent or delay the entry of generic CPPs into the market—which is precisely what happened with the Relevant AIs here.

## MANUFACTURER DEFENDANTS' UNLAWFUL CONDUCT

55.    Manufacturer Defendants each use "loyalty programs" with their distributors that are designed to prevent generic competitors from being able to access much of the U.S. CPP market.

56.    Manufacturer Defendants' loyalty programs were established with the intention of maintaining monopolistic or near-monopolistic exclusivity for their CPPs even after the patent and regulatory protection on the CPPs expired.

57.    Co-conspirator distributors and retailers agree to strictly limit their purchases of competitive generic CPPs (those that have lost patent and regulatory protection) in exchange for large payments from Manufacturer Defendants.

58.    These large "bonus" payments were a conduit for Manufacturer Defendants to share monopoly profits with such distributors and retailers to secure their cooperation with the anticompetitive scheme described herein.

59.    Manufacturer Defendants' loyalty programs, in fact, have achieved these goals. Generic competition for CPPs containing the Relevant AIs has been greatly inhibited due to Manufacturer Defendants' loyalty programs. The co-conspirator distributors and retailers have

excluded and minimized the distribution and sale of generic versions of such CPPs (and continue to do so).

60.    Moreover, the small quantities of CPPs containing generic Relevant AIs that are still able to be sold are significantly more expensive because output is significantly restricted, and prices are artificially higher as a result—thereby allowing generic manufacturers to price their CPPs significantly higher than they otherwise would have priced them in a free, open, and competitive market across the distribution channel.

### A.    Syngenta's Key AI Loyalty Program.

61.    Syngenta's loyalty program is called the "Key AI" program. The Co-Conspirator Distributors agree to participate in the Key AI program.

62.    The Key AI program is intended to and, in fact, does reduce or exclude generic competition for Syngenta CPPs that have lost patent and regulatory exclusivity.

63.    Under the Key AI program, a substantial portion of the Co-Conspirator Distributors' overall CPP purchases must be Syngenta CPPs that have lost patent and regulatory exclusivity to receive loyalty program payments, thereby severely limiting their purchases of generic versions of such CPPs.

64.    As a result of reducing or excluding generic CPP competition, Syngenta continues to charge high prices for its CPPs and maintain high market share even after the CPPs have lost patent and regulatory exclusivity—thereby allowing Syngenta to earn supra-competitive profits that it would not otherwise receive if there was a free, open, and competitive market across the distribution channel.

65.    Syngenta uses its loyalty program incentive payments to Co-Conspirator Distributors to encourage their agreement to, and cooperation in, this scheme, sharing part of its supra-competitive profits with them in exchange for their role in reducing or excluding generic

CPP competition.

**B.    Corteva's Loyalty Program.**

66.    Corteva's loyalty program is intended to and, in fact, does reduce or exclude generic competition for Corteva CPPs that have lost patent and regulatory exclusivity.

67.    Under Corteva's loyalty program, a substantial portion of Co-Conspirator Distributors' overall CPP purchases must be Corteva CPPs that have lost patent and regulatory exclusivity to receive loyalty program payments, thereby severely limiting their purchases of generic versions of such CPPs.

68.    As a result of reducing or excluding generic CPP competition, Corteva continues to charge high prices for its CPPs and maintain high market share even after the CPPs have lost patent and regulatory exclusivity—thereby allowing Corteva to earn supra-competitive profits that it would not otherwise receive if there was a free, open, and competitive market across the distribution channel.

69.    Corteva uses its loyalty program incentive payments to Co-Conspirator Distributors to encourage their agreement to, and cooperation in, this scheme, sharing part of its supra-competitive profits with them in exchange for their role in reducing or excluding generic CPP competition.

**C.    Market Effects of Loyalty Programs.**

70.    Syngenta and Corteva have entered into loyalty program agreements with Co-Conspirator Distributors of CPPs in the United States. Corteva also has entered into loyalty program agreements with major distributors that are also major national retailers of CPPs.

71.    Since the major distributors have such a large market share of the traditional distribution channel, and thereby control a large share of all CPP sales to farmers, Syngenta's and Corteva's loyalty programs substantially impact the U.S. CPP market, significantly restricting competition for the CPPs containing the Relevant AIs, which results in higher CPP prices to

farmers and extended increased profits for Syngenta and Corteva.

72.    The fact that the major distributors know their competitors participate in these loyalty programs means that each major distributor knows that no one distributor will leave a loyalty program and sell lower priced generic CPPs because it would undermine the entire scheme and jeopardize the large profits the distributors generate from the loyalty programs.

73.    Since the loyalty programs require the Co-Conspirator Distributors and retailers to purchase a substantial share of their CPPs containing the Relevant AIs from Syngenta and Corteva or risk losing the incentive payments, there is no incentive for them to deal with generic CPP competitors at all.

74.    Moreover, the small quantities of CPPs containing generic Relevant AIs that are still able to be sold are significantly more expensive because output is significantly restricted, and prices are artificially higher as a result—thereby allowing generic manufacturers to price their CPPs significantly higher than they otherwise would have priced them in a free, open, and competitive market across the distribution channel.

**D.    Syngenta CPPs Subject to the Key AI Loyalty Program.**

75.    Syngenta's Key AI loyalty program includes CPPs containing three of the Relevant AIs for which patent and regulatory exclusivities have expired: MESOTRIONE, AZOXYSTROBIN, and METOLACHLOR (and s-METOLACHLOR, as explained below).

76.    MESOTRIONE is an herbicide that controls common weeds in corn fields.

77.    After Syngenta's patent and regulatory exclusivity for MESOTRIONE expired, generic manufacturers introduced generic versions of CPPs containing MESOTRIONE that were priced significantly lower than Syngenta's branded versions.

78.    However, due to Syngenta's loyalty program, the generic manufacturers were not able to gain any significant market share in the market for generic CPPs containing

MESOTRIONE despite their products having the same AIs and being much cheaper.

79.     To meet the Key AI loyalty program's share requirement and continue to receive large incentive payments, Co-Conspirator Distributors strictly limit purchases of generic CPPs containing MESOTRIONE (or do not purchase generics at all). Co-Conspirator Distributers do not promote generic CPPs containing MESOTRIONE and they encourage their customers to buy Syngenta's CPPs containing MESOTRIONE rather than equally effective generic competitors.

80.     The Key AI program has effectively minimized generic competition for Syngenta in the market for CPPs containing MESOTRIONE and caused at least two generic manufacturers to postpone or cancel introducing a MESOTRIONE CPP in the United States.

81.     This greatly reduced competition has resulted in much higher profits for Syngenta from sales of brand-name CPPs containing MESOTRIONE than it would have otherwise received in a free, open, and competitive market across the distribution channel.

82.     AZOXYSTROBIN is a fungicide used to kill and control fungal diseases on crops.

83.     After Syngenta's patent and regulatory exclusivity for AZOXYSTROBIN expired, generic manufacturers introduced generic versions of CPPs containing AZOXYSTROBIN that were priced significantly lower than Syngenta's branded versions.

84.     However, due to Syngenta's loyalty program, the generic manufacturers were not able to gain any significant market share in the market for generic CPPs containing AZOXYSTROBIN despite their products having the same AIs and being much cheaper.

85.     To meet the Syngenta loyalty program's share requirement and continue to receive large incentive payments, Co-Conspirator Distributors strictly limit purchases of generic CPPs containing AZOXYSTROBIN (or do not purchase generics at all). The Co-Conspirator Distributers do not promote generic CPPs containing AZOXYSTROBIN and encourage their customers to buy Syngenta's CPPs containing AZOXYSTROBIN rather than equally effective generic competitors.

86.     This has effectively minimized generic competition for Syngenta in the market for CPPs containing AZOXYSTROBIN and caused at least two generic manufacturers to postpone or cancel introducing a AZOXYSTROBIN CPP in the United States.

87.     This greatly reduced competition has resulted in much higher profits for Syngenta from sales of brand-name CPPs containing AZOXYSTROBIN than it would have otherwise received in a free, open, and competitive market across the distribution channel.

88.     METOLACHLOR is an herbicide that controls common weeds in various crop fields, including corn, soybeans, and sorghum.

89.     Products containing METOLACHLOR typically contain a 50-50 mixture of s-METOLACHLOR and r- METOLACHLOR, which have identical molecular makeups but are arranged differently (like a left and right glove).  Syngenta's CPPs containing METOLACHLOR, however, are predominantly s-METOLACHLOR (*i.e.*, 88% s-METOLACHLOR and 12% r-METOLACHLOR).  CPPs using predominantly s-METOLACHLOR are far more effective at killing weeds than CPPs with the 50-50 METOLACHLOR mix.

90.     After Syngenta's patent and regulatory exclusivity for METOLACHLOR expired, generic manufacturers introduced generic versions of CPPs containing METOLACHLOR that were priced significantly lower than Syngenta's branded versions.

91.     However, due to Syngenta's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for generic CPPs containing METOLACHLOR despite their products having the same AIs and being much cheaper.

92.     To meet the Syngenta loyalty program's share requirement and continue to receive large incentive payments, Co-Conspirator Distributors strictly limit purchases of generic CPPs containing METOLACHLOR (or do not purchase generics at all). Co-Conspirator Distributors do not promote generic CPPs containing METOLACHLOR, and they encourage their customers to

buy Syngenta's CPPs containing METOLACHLOR rather than equally effective generic competitors.

93.    This has effectively minimized generic competition for Syngenta in the market for CPPs containing METOLACHLOR and caused at least two generic manufacturers to postpone or cancel introducing a METOLACHLOR CPP in the United States.

94.    This greatly reduced competition has resulted in much higher profits for Syngenta from sales of brand-name CPPs containing METOLACHLOR than it would have otherwise received in a free, open, and competitive market across the distribution channel.

95.    The Co-Conspirator Distributors and retailers have received (and continue to receive) loyalty program payments from Syngenta for cooperating with Syngenta's above-described scheme to restrain trade in its Relevant AIs and generated substantial illicit profits doing so.

**E.    Corteva CPPs Subject to Corteva's Loyalty Program.**

96.    Corteva's loyalty program includes CPPs containing three of the Relevant AIs for which patent and regulatory exclusivities have expired: OXAMYL, RIMSULFURON, and ACETOCHLOR.

97.    OXAMYL is an insecticide and nematicide used to control pests in various crop fields, including cotton fields and fruit and vegetable fields.

98.    After Corteva's patent and regulatory exclusivity for OXAMYL expired, generic manufacturers introduced generic versions of CPPs containing OXAMYL that were priced significantly lower than Corteva's branded versions.

99.    However, due to Corteva's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for generic CPPs containing OXAMYL despite their products having the same AIs and being much cheaper.

100.    To meet the Corteva loyalty program's share requirement and continue to receive large incentive payments, Co-Conspirator Distributors strictly limit purchases of generic CPPs containing OXAMYL (or do not purchase generics at all). Co-Conspirator Distributors do not promote generic CPPs containing OXAMYL, and they encourage their customers to buy Corteva's CPPs containing OXAMYL rather than equally effective generic competitors.

101.    This has effectively minimized generic competition for Corteva in the market for CPPs containing OXAMYL and caused at least two generic manufacturers to postpone or cancel introducing an OXAMYL CPP in the United States.

102.    This greatly reduced competition has resulted in much higher profits for Corteva from sales of brand-name CPPs containing OXAMYL than it would have otherwise received in a free, open, and competitive market across the distribution channel.

103.    RIMSULFURON is an herbicide used to hinder weed growth in various crop fields. After Corteva's patent and regulatory exclusivity for RIMSULFURON expired, generic manufacturers introduced generic versions of CPPs containing RIMSULFURON that were priced significantly lower than Corteva's branded versions.

104.    However, due to Corteva's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for generic CPPs containing RIMSULFURON despite their products having the same AIs and being much cheaper.

105.    To meet the Corteva loyalty program's share requirement and continue to receive large incentive payments, Co-Conspirator Distributors strictly limit purchases of generic CPPs containing RIMSULFURON (or do not purchase generics at all). Co-Conspirator Distributors do not promote generic CPPs containing RIMSULFURON, and they encourage their customers to buy Corteva's CPPs containing RIMSULFURON rather than equally effective generic competitors.

106.    This has effectively minimized generic competition for Corteva in the market for

CPPs containing RIMSULFURON and caused at least two generic manufacturers to postpone or cancel introducing a RIMSULFURON CPP in the United States.

107.    This greatly reduced competition has resulted in much higher profits for Corteva from sales of brand-name CPPs containing RIMSULFURON than it would have otherwise received in a free, open, and competitive market across the distribution channel.

108.    ACETOCHLOR is an herbicide that inhibits weed growth in corn, soybean, and sugar beet fields.

109.    Corteva and Bayer are joint venture partners that own the U.S. registration for ACETOCHLOR. Bayer manufactures the ACETOCHLOR and Corteva sells CPPs containing ACETOCHLOR covered by the Corteva loyalty program

110.    After Corteva's patent and regulatory exclusivity for ACETOCHLOR expired, generic manufacturers introduced generic versions of CPPs containing ACETOCHLOR that were priced significantly lower than Corteva's branded versions.

111.    However, due to Corteva's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for generic CPPs containing ACETOCHLOR despite their products having the same AIs and being much cheaper.

112.    To meet the Corteva loyalty program's share requirement and continue to receive large incentive payments, Co-Conspirator Distributors strictly limit purchases of generic CPPs containing ACETOCHLOR (or do not purchase generics at all). Co-Conspirator Distributors do not promote generic CPPs containing ACETOCHLOR, and they encourage their customers to buy Corteva's CPPs containing ACETOCHLOR rather than equally effective generic competitors.

113.    This has effectively minimized generic competition for Corteva in the market for CPPs containing ACETOCHLOR and caused at least two generic manufacturers to postpone or cancel introducing an ACETOCHLOR CPP in the United States.

114.    This greatly reduced competition has resulted in much higher profits for Corteva from sales of brand-name CPPs containing ACETOCHLOR than it would have otherwise received in a free, open, and competitive market across the distribution channel.

115.    The Co-Conspirator Distributors have received (and continue to receive) loyalty program payments from Corteva for cooperating with Corteva's above-described scheme to restrain trade in its Relevant AIs and generated substantial illicit profits doing so.

## RELEVANT MARKETS

116.    At all relevant times, Syngenta had (and has) market and monopoly power with respect to CPPs containing AZOXYSTROBIN, MESOTRIONE, METOLACHLOR, and s-METOLACHLOR.  Syngenta had (and has) the power to maintain the prices of CPPs containing these Relevant AIs at supra-competitive levels without losing substantial sales to other CPPs used for the same purposes.

117.    At all relevant times, Corteva had (and has) market and monopoly power in the markets for CPPs containing OXAMYL and RIMSULFURON and had (and has) market power with respect to CPPs containing ACETOCHLOR. Corteva had (and has) the power to maintain the prices of CPPs containing these Relevant AIs at supra-competitive levels without losing substantial sales to other CPPs used for the same purposes.

118.    To the extent Plaintiff's claims require the definition of a relevant market, it is the market for EPA-registered CPPs for sale in the United States containing the Relevant AIs, as follows:

119.    For  the Relevant AI AZOXYSTROBIN, the relevant market is the market for EPA-registered CPPs for sale in the United States containing AZOXYSTROBIN, including Syngenta's CPPs containing AZOXYSTROBIN and any generic versions of such CPPs;

120.    For  the Relevant AI MESOTRIONE, the relevant market is the market for EPA-

registered CPPs for sale in the United States containing MESOTRIONE, including Syngenta's CPPs containing MESOTRIONE and any generic versions of such CPPs;

121.    For  the Relevant AI METOLACHLOR, the relevant market is the market for EPA-registered CPPs for sale in the United States containing METOLACHLOR, including Syngenta's CPPs containing METOLACHLOR and any generic versions of such CPPs; and

122.    For  the Relevant AI s-METOLACHLOR, the relevant market is the market for EPA-registered CPPs for sale in the United States containing s-METOLACHLOR, including Syngenta's CPPs containing s-METOLACHLOR and any generic versions of such CPPs.

123.    For  the Relevant AI OXAMYL, the relevant market is the market for EPA-registered CPPs for sale in the United States containing OXAMYL, including Corteva's CPPs containing OXAMYL and any generic versions of such CPPs;

124.    For  the Relevant AI RIMSULFURON, the relevant market is the market for EPA-registered CPPs for sale in the United States containing RIMSULFURON, including Corteva's CPPs containing s RIMSULFURON and any generic versions of such CPPs; and

125.    For  the Relevant AI s ACETOCHLOR, the relevant market is the market for EPA-registered CPPs for sale in the United States containing ACETOCHLOR, including Corteva's CPPs containing ACETOCHLOR and any generic versions of such CPPs.

126.    To the extent Plaintiff's claims require the definition of a relevant geographic market, it the United States. The EPA must approve CPPs for sale and use in the United States. Farmers in the United States are not allowed to legally use CPPs from other countries that have not been approved for sale and use in the United States. Thus, the price of CPPs in other countries does not affect the market for CPPs in the United States.

127.    Manufacturer Defendants dominate the markets for CPPs containing the Relevant AIs despite the fact that such CPPs do not currently possess patent and regulatory exclusivities.

There are significant barriers prohibiting generic manufacturers from entering the market for any CPP containing the Relevant AIs, including patent and regulatory barriers, EPA registration, access to supplies of active and inactive ingredients, manufacturing facilities and know-how, and the ability to distribute CPPs effectively. Manufacturer Defendants' wrongful actions also created barriers to entry for generic manufacturers of CPPs containing the Relevant AIs that prevent them from accessing the traditional distribution channels and competing effectively in such markets.

128.    For each CPP containing a Relevant AI, its only reasonable substitute is a generic version of the CPP containing a generic version of the Relevant AI. Other CPPs with different AIs will attack different types of weeds or pests, be suitable for different climate and weather conditions or types of crops, and/or have different modes of action in terms of the chemical and biological reactions used to target particular weeds or pests and, therefore, would obtain different results than a CPP containing a Relevant AI.

129.    MESOTRIONE is differentiated from other CPP AIs used for similar purposes due to its greater efficacy and crop safety and lower use rate than other CPPs.

130.    AZOXYSTROBIN is differentiated from other CPP AIs used for similar purposes because it can be used with all major row crops, making application easier. It also is claimed to have growth-promoting effects on crops.

131.    METOLACHLOR is differentiated from other CPP AIs used for similar purposes due to its greater solubility in water (which improves its performance in drier conditions), better performance in warmer conditions, and ability to be used in a wider variety of crop fields. s-METOLACHLOR has the same advantages of METOLACHLOR but with an even greater efficacy in killing weeds.

132.    OXAMYL is differentiated from other CPP AIs used for similar purposes because it has less risk to crops and/or soil health and can be applied directly onto crops instead of applied

at root level or in the soil.

133.    RIMSULFURON is differentiated from other CPP AIs used for similar purposes because it affects more different types of weeds, it can be used with a wider variety of crop fields, and it can be used preemptively to prevent weed growth as well controlling an existing weed problem.

134.    ACETOCHLOR is differentiated from other CPP AIs used for similar purposes due to its superior performance in wetter or cooler conditions, its greater efficacy against particular types of weeds, and its greater efficacy earlier in the growing season.

135.    A small but significant and non-transitory artificial inflation of the price of any CPPs containing the Relevant AIs would not cause a significant number of consumers to purchase CPPs with different AIs so as to make such price inflation unprofitable. A small but significant and non-transitory artificial inflation of the price of any CPPs with different AIs than the Relevant AIs would not cause a significant number of farmers to purchase CPPs containing the Relevant AIs instead so as to make such artificial price inflation unprofitable.

## ANTITRUST IMPACT AND DAMAGES TO THE CLASSES

136.    Syngenta's and Corteva's CPP loyalty programs, with cooperation and assistance of the unnamed Co-Conspirator Defendants, were intended to, and in fact did, exclude and/or reduce generic competition for the manufacture and sale of CPPs containing the Relevant AIs in the United States.

137.    As such, Plaintiff and Class members paid (and continue to pay) more for brand-name CPPs containing the Relevant AIs, as well as their generic CPP competitors, than what they would have paid in a free, open, and competitive market across the distribution channel.  Plaintiff and Class members have sustained (and continue to sustain) substantial losses and damage to their businesses and property in the form of the overcharges on such purchases of CPPs containing the

Relevant AIs, as well as their generic CPP competitors.  The types and amounts of their antitrust

damages will be determined after discovery and upon proof at trial. Plaintiff's and Class members'

antitrust damages, injury, and harm, which are the foreseeable, direct, an/or proximate result of

Defendants' anticompetitive conduct, are ongoing.

## CLASS ACTION ALLEGATIONS

138.    Pursuant to FED. R. CIV. P. 23, Plaintiff brings this action against Defendants as a

class action, for itself and all members of the following class of similarly situated individuals and

entities (the "Class Members"):

> All persons or entities in the United States that purchased crop protection
> products ("CPPs") containing MESOTRIONE, AZOXYSTROBIN,
> METOLACHLOR, s- METOLACHLOR, OXAMYL, RIMSULFURON, or
> ACETOCHLOR  directly from a distributor or retailer that participated in the
> Syngenta and/or Corteva CPP loyalty programs, from at least as early as January 1,
> 2017, to the present (the "Class Period").

139.    Excluded from the Class are (i) Manufacturer Defendants and their subsidiaries,

affiliates, directors, officers, and employees, and (ii) all state and federal government entities and

agencies, including the Court and Court personnel.

140.    Hundreds of thousands of persons and entities geographically dispersed across the

United States purchased CPPs containing the Relevant AIs, as well as their generic competing CPPs,

directly from a co-conspirator distributor or retailer that participated in the Syngenta and/or

Corteva CPP loyalty programs during the Class Period. Accordingly, the Class members are so

numerous that joinder of them in one action is impracticable.

141.    By their above-described anticompetitive conduct and wrongful actions,

Manufacturer Defendants and their co-conspirator distributors and retailers violated the rights of

Plaintiff and each Class Member in the same way by overcharging for CPPs containing the Relevant

AIs, as well as their generic competing CPPs, that, in turn, resulted in the infliction of antitrust

injury, harm, and damages on Plaintiff's and Class Members' businesses and property.

142.    Certain questions of law and fact common to the proposed Class predominate over any questions affecting individual Class Members, including, *inter alia*:

143.    Whether Syngenta had anticompetitive monopoly power in the markets for CPPs containing MESOTRIONE, AZOXYSTROBIN, and METOLACHLOR by means of its CPP loyalty program;

144.    Whether Syngenta's CPP loyalty program was intended to and/or did, in fact, exclude or reduce generic competition for CPPs containing MESOTRIONE, AZOXYSTROBIN, and METOLACHLOR;

145.    Whether Syngenta and its co-conspirator distributors and retailers conspired to restrain trade in the markets for CPPs containing MESOTRIONE, AZOXYSTROBIN, and METOLACHLOR;

146.    Whether Corteva had anticompetitive monopoly power in the markets for CPPs containing OXAMYL, RIMSULFURON, and/or ACETOCHLOR by means of its CPP loyalty program;

147.    Whether Corteva's CPP loyalty program was intended to and/or did, in fact, exclude or reduce generic competition for CPPs containing OXAMYL, RIMSULFURON, and ACETOCHLOR;

148.    Whether Corteva and its co-conspirator distributors and retailers conspired to restrain trade in the markets for CPPs containing OXAMYL, RIMSULFURON, and/or ACETOCHLOR;

149.    Whether Syngenta's alleged anticompetitive conduct violated (and continues to violate) Section 1 of the Sherman Act, 15 U.S.C. § 1;

150.    Whether Corteva's alleged anticompetitive conduct violated (and continues to violate) Section 1 of the Sherman Act, 15 U.S.C. § 1;

151.    Whether the co-conspirator distributors' and retailers' alleged anticompetitive conduct violated (and continues to violate) Section 1 of the Sherman Act, 15 U.S.C. § 1;

152.    Whether Syngenta's alleged anticompetitive conduct violated (and continues to violate) Section 2 of the Sherman Act, 15 U.S.C. § 2;

153.    Whether Corteva's alleged anticompetitive conduct violated (and continues to violate) Section 2 of the Sherman Act, 15 U.S.C. § 2;

154.    Whether the co-conspirator distributors' and retailers' alleged anticompetitive conduct violated (and continues to violate) Section 2 of the Sherman Act, 15 U.S.C. § 2;

155.    Whether Syngenta's alleged anticompetitive conduct was (and continues to be) an unreasonable restraint of trade;

156.    Whether Corteva's alleged anticompetitive conduct was (and continues to be) an unreasonable restraint of trade;

157.    Whether the co-conspirator distributors' and retailers' alleged anticompetitive conduct was (and continues to be) an unreasonable restraint of trade;

158.    Whether Syngenta's, Corteva's, and their co-conspirator distributors' and retailers' alleged anticompetitive conduct directly and/or proximately caused Plaintiff's and Class Members antitrust injury, harm, and damages to their businesses and property;

159.    Whether Plaintiff's and Class members are entitled to injunctive and/or equitable relief and, if so, the form of such relief;

160.    Whether Syngenta, Corteva, and/or their co-conspirator distributors and retailers fraudulently concealed their alleged anticompetitive conduct; and

161.    Whether Plaintiff and Class members could reasonably have known about Syngenta's, Corteva's, and their co-conspirator distributors' and retailers' alleged anticompetitive conduct prior to the Federal Trade Commission filing its complaint in September 2022.

162.    Plaintiff's claims are typical of Class Members' claims because Plaintiff and Class Members are all victims of the same above-described anticompetitive schemes involving CPPs containing the Relevant AIs perpetrated on them by Syngenta, Corteva, and their co-conspirator distributors and retailers.

163.    Plaintiff and its counsel will fairly and adequately represent the interests of Class Members. Plaintiff has no interests antagonistic to, or in conflict with, the interests of any Class Members. Plaintiff's counsel is experienced in leading and prosecuting large multi-district antitrust class actions, and do not anticipate any difficulties in managing this action as a class action.

164.    A class action is superior to all other available methods for fairly and efficiently adjudicating Plaintiff's and Class Members' claims. Plaintiff and Class Members have been (and will continue to be) harmed, injured, and damaged as a direct and/or proximate result of Syngenta's, Corteva's, and their co-conspirator distributors' and retailers' alleged anticompetitive conduct. Litigating this case as a class action is appropriate because (i) it will avoid a multiplicity of suits and the corresponding burden on the courts and Parties, (ii) it would be virtually impossible for all Class Members to intervene as individual parties-plaintiff in this action, and (iii) it will provide court oversight of the claims process once Manufacturer Defendants' liability is adjudicated.

165.    Certification, therefore, is appropriate under FED. R. CIV. P. 23(b)(3) because the above-described common questions of law or fact predominate over any questions affecting individual Class Members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

166.    Certification also is appropriate under FED. R. CIV. P. 23(b)(2) because Manufacturer Defendants and their co-conspirator distributors and retailers have acted (or refused to act) on grounds generally applicable to the Class, thereby making equitable relief appropriate

for the Class as a whole.

167.    Certification also is appropriate under FED. R. CIV. P. 23(b)(1) because the prosecution of separate actions by individual Class Members would create a risk of establishing incompatible standards of conduct for Manufacturer Defendants and their co-conspirator distributors and retailers. For example, individual actions could be dispositive of the interests of other Class Members who are not parties to such actions, and substantially impair or impede their ability to protect their interests.

168.    Syngenta's, Corteva's, and their co-conspirator distributors' and retailers' alleged anticompetitive conduct are applicable to the Class as a whole, for which Plaintiff seeks, *inter alia*, damages and other equitable remedies.

169.    Absent a class action, Syngenta, Corteva, and their co-conspirator distributors and retailers will retain the benefits of their wrongdoing despite seriously violating the law and inflicting actual and consequential antitrust injury, harm, and damages on Plaintiff and Class Members and their property and businesses.

## DEFENDANTS' FRAUDULENT CONCEALMENT OF THE CPP LOYALTY PROGRAM SCHEME AND CONSPIRACY

170.    Manufacturer Defendants and their co-conspirator distributors and retailers effectively, affirmatively, and fraudulently concealed their CPP loyalty program scheme and conspiracy from Plaintiff and Class members. Plaintiff and Class members are farmers; they do not specialize in the manufacturing, marketing, and sales of CPPs. Plaintiff and Class members simply purchase CPPs from Manufacturer Defendants and their co-conspirator distributors and retailers and apply them to their crops and fields.

171.    Manufacturer Defendants and their co-conspirator distributors and retailers used various means and methods to fraudulently conceal their CPP loyalty program scheme and conspiracy from Plaintiff and Class members, including, without limitation, (i) entering into

private CPP loyalty program agreements that were not publicly disclosed to Plaintiff and Class members or disclosed in legally mandated public disclosure documents, such as Syngenta's and Corteva's SEC filings, (ii) secret meetings, (iii) surreptitious communications between Manufacturer Defendants and their co-conspirator distributors and retailers by telephone or in person meetings to prevent the existence of written records, and (iv) statements to Plaintiff and Class members designed to deceive Plaintiff about the real factors involved in the prices that Plaintiff paid for CPPs containing the Relevant AIs, as well as their generic CPP counterparts.

172.    Manufacturer Defendants and their co-conspirator distributors and retailers engaged in secret behavior intended to advance their CPP loyalty program scheme and conspiracy for the purpose of reaping substantially higher profits on such CPPs over an extended time period than they otherwise would have generated in a free, open, and competitive market. Manufacturer Defendants' and their co-conspirator distributors' and retailers' CPP loyalty program scheme and scheme and conspiracy—based on behavior known only by them to be illegal at the time they engaged in such behavior—plausibly suggest they engaged in a campaign of fraudulent concealment.

173.    In addition to Manufacturer Defendants and their co-conspirator distributors and retailers affirmatively concealing their CPP loyalty program scheme and conspiracy, the conspiracy was inherently self-concealing because it depended on secrecy for its successful operation.

174.    Until the Federal Trade Commission ("FTC") and various states filed their complaint in federal court on September 29, 2022 (the "FTC Complaint"), Plaintiff and Class members had neither actual, nor constructive, knowledge of the facts constituting their claims for relief as stated in this Complaint. Plaintiff and Class members did not discover, and could not have discovered, through the exercise of reasonable diligence, the existence of the CPP loyalty program

scheme and conspiracy alleged herein until the FTC filed its complaint. Until then, Manufacturer Defendants and their co-conspirator distributors and retailers engaged in the secret CPP loyalty program scheme and conspiracy and did not reveal facts that would put Plaintiff and Class members on inquiry notice that such a scheme and conspiracy existed. Throughout the Relevant Period, Manufacturer Defendants effectively, affirmatively, and fraudulently concealed their unlawful CPP loyalty program scheme and conspiracy from Plaintiff and Class members.

175.    Plaintiff and Class members also lacked the facts and information necessary to form a good faith basis for believing that any legal violations had occurred. Reasonable diligence by Plaintiff and Class members would not have uncovered those facts more than four years before the filing of this Complaint.

176.    All applicable statutes of limitations affecting Plaintiff's and Class members' claims, therefore, have been tolled. As such, Plaintiff and Class members are entitled to recover damages reaching back beyond four years of the filing of this Complaint.

## MANUFACTURER DEFENDANTS' ONGOING AND CONTINUING ANTITRUST VIOLATIONS

177.    A continuing violation operates in two ways: (i) it restarts the statute of limitations period each time Defendants commit an overt act, and (ii) it occurs where, as here, Defendants' anticompetitive conduct causes a continuing harm to Plaintiff and Class members.

A.    **Manufacturer Defendants and their Co-Conspirator Distributors and Retailers Renewed their CPP Loyalty Program Scheme and Conspiracy with New and Independent Acts.**

178.    From the start of their CPP loyalty program scheme and conspiracy, at least as early as the beginning of 2017, and continuing through the effects of the CPP loyalty program scheme and conspiracy, Manufacturer Defendants and their co-conspirators sold CPPs containing the Relevant AIs to purchasers, such as Plaintiff and Class members, at artificially high prices resulting from Manufacturer Defendants' and their co-conspirator distributors' and retailers' CPP loyalty

program agreements. A cause of action accrued for Plaintiff and Class members each time they bought CPPs containing the AIs CPPs or their generic CPP competitors covered by Manufacturer Defendants' and their co-conspirators' loyalty program agreements at supra-competitive prices, which constituted another overt act in furtherance of their anticompetitive CPP loyalty program scheme and conspiracy. Accordingly, even though certain of the loyalty program agreements were entered into more than four years prior to the filing of this Complaint, Plaintiff and Class members are entitled to recover damages on all their purchases at supra-competitive prices of CPPs containing the Relevant AIs, as well as their generic CPP competitors, within, at the very least, four years of the filing of this Complaint.

179.    Manufacturer Defendants' and their co-conspirator distributors' and retailers' conspiratorial meetings, communications, and nondisclosures were among the overt acts that commenced running a new statute of limitations because such meetings, communications, and nondisclosures advanced the objectives of their CPP loyalty program scheme and conspiracy. Manufacturer Defendants and their co-conspirator distributors and retailers also committed new overt acts each time they took actions to implement their CPP loyalty program scheme and conspiracy, such as by entering into loyalty program agreements and selling CPPs containing the Relevant AIs, as well as their generic CPP competitors, to Plaintiff and Class members at supra-competitive prices.

180.    Each sale of CPPs containing the Relevant AIs, as well as their generic CPP competitors, by Manufacturer Defendants and/or their co-conspirator distributors and retailers to Plaintiff and Class members at a supra-competitive price also was a new overt act and antitrust violation injuring Plaintiff and Class members that started the statutory period running again.

181.    Manufacturer Defendants' and their co-conspirator distributors' and retailers' overt acts, including, without limitation, those mentioned above, were new and independent acts that

perpetuated their loyalty program agreements; they were not merely reaffirmations of Manufacturer Defendants' and their co-conspirator distributors' and retailers' previous acts. By constantly selling CPPs containing the Relevant AIs, as well as their generic CPP competitors, to Plaintiff and Class members at supra-competitive prices Manufacturer Defendants and their co-conspirator distributors and retailers inflicted new and accumulating injury, harm, and damages on Plaintiff's and Class members' businesses and property.

   **B.    Manufacturer Defendants and Their Co-Conspirator Distributors and Retailers Inflicted New and Accumulating Injury on Plaintiff and Class Members.**

   182.    Plaintiff and Class members purchased CPPs containing the Relevant AIs, as well as their generic CPP competitors, from Manufacturer Defendants and their co-conspirators, from the beginning of the CPP loyalty program scheme and conspiracy until the present and will continue to do so in the future.

   183.    Each such purchase by Plaintiff and Class members from Manufacturer Defendants and their co-conspirators at a price that was higher, or will be higher in the future, resulting from Manufacturer Defendants' and their co-conspirators' CPP loyalty program scheme and conspiracy necessarily caused Plaintiff to suffer new and accumulating injury, harm, and damages.

   184.    As the concept of a continuing violation applies to a scheme and conspiracy that brings about a series of unlawfully high-priced sales over several years, each sale of CPPs containing the Relevant AIs, as well as their generic CPP competitors, to Plaintiff and Class members by Manufacturer Defendants or their co-conspirators starts the statutory period running again, regardless of Plaintiff's and/or Class members' knowledge about the unlawful CPP loyalty program scheme and conspiracy at an earlier time. This means that each illegally priced direct sale of CPPs containing the Relevant AIs, as well as their generic CPP competitors, to Plaintiff and Class members by Manufacturer Defendants or their co-conspirators created a new cause of action

for purposes of the statute of limitations.

185.    Manufacturer Defendants' and their co-conspirators' CPP loyalty program scheme and conspiracy continued into the period four years before the FTC Complaint was filed, and into the period four years before the filing of the first direct purchaser class action complaint.

186.    Manufacturer Defendants and their co-conspirator distributors and retailers constantly coordinated and communicated with each other beginning in 2017 and through the present. Including in this manner, Manufacturer Defendants' and their co-conspirator distributors' and retailers' CPP loyalty program scheme and conspiracy continued when their CPP sales to Plaintiff and Class members were made during the period four years preceding the filing of the FTC Complaint, and during the period four years preceding the filing of the first direct purchaser class action complaint.

187.    Manufacturer Defendants' and their co-conspirator distributors' and retailers' CPP loyalty program scheme and conspiracy were intended to and, in fact, did inflict continuing injury, harm, and damages on Plaintiff's and Class members businesses and property.

## CLAIMS AND CAUSES OF ACTION

### COUNT ONE
### VIOLATION OF § 1 OF THE SHERMAN ACT (15 U.S.C. § 1)

188.    The preceding factual statements and allegations are incorporated by reference.

189.    Defendants violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by entering into unlawful loyalty program agreements that were intended to and did, in fact, restrain generic competition in the markets for CPPs containing the Relevant AIs.

190.    Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, injured, harmed, and damaged Plaintiff and Class members in their businesses or property. Plaintiff's and Class members' damages consist of paying higher prices for CPPs containing the Relevant AIs and their generic competitor CPPs than they otherwise would have paid in a free,

open, and competitive market across the distribution channels. Such injury, harm, and damages, also known as "overcharges," are of the type that the antitrust laws are designed to prevent, and it flows Manufacturer Defendants' alleged anticompetitive and unlawful conduct.

191.    But for Defendants' wrongful conduct, as alleged herein, genuine competition from generic manufacturers for each of such CPPs would have greatly reduced retail prices at all points across the distribution channel, including the prices paid by Plaintiff and Class members.

192.    Manufacturer Defendants entered into the CPP loyalty program agreements with their Co-Conspirator Distributors And Retailers under which Manufacturer Defendants made large payments to their co-conspirators in exchange for such distributors and retailers minimizing their purchases and sales of generic CPP competitors of the brand-name CPPs containing the Relevant AIs manufactured by Manufacturer Defendants. Defendants entered into the CPP loyalty program agreements to and, in fact, did unreasonably restrain trade in the markets for such CPPs, the purpose and effect of which was to: (i) prevent generic competitors for the CPPs containing the Relevant AIs from accessing large parts of the market, and (ii) allow their own name-brand CPPs containing the Relevant AIs to be sold at significantly higher prices and still maintain most of the market, thereby artificially increasing the prices that Plaintiff and Class members paid for such CPPs. Manufacturer Defendants also used the loyalty programs to divert a portion of their supra-competitive profits from their scheme and conspiracy to their Co-Conspirator Distributors and Retailers to secure their cooperation with the scheme.

193.    There is and was no legitimate, non-pretextual, pro-competitive business justification for Defendants' anticompetitive conduct that outweighs its harmful effect on CPP purchasers and competition. Defendants' conduct can only be explained by anticompetitive motives and a desire to foreclose competition in the markets for CPPs containing the Relevant AIs. Even if there were some conceivable and cognizable justification, Defendants' CPP loyalty

program agreements were not necessary to achieve such a purpose. Any supposed procompetitive benefits are false and pretextual and/or could have been achieved in a less restrictive manner.

194.    Moreover, the small quantities of the generic competitor CPPs that are still sold are significantly more expensive because output in their markets is significantly restricted, thereby empowering generic manufacturers to price such generic CPPs significantly higher than they would be prices in a free, open, and competitive market across the distribution channel.

195.    As a direct and/or proximate result of Defendants' and their co-conspirator distributors' and retailers' anticompetitive conduct involving the CPP loyalty program agreements, Plaintiff and Class members have been (and will continue to be) harmed.

196.    As a direct, material, and/or proximate result of Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Plaintiff and Class members have suffered (and will continue to suffer) injury and harm to their business or property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15(a). As such, Plaintiff and Class members are entitled to treble damages for Defendants' violations of Section 1 of the Sherman Antitrust Act, under Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

197.    Defendants' unlawful anticompetitive conduct continues and, unless restrained, will continue. Unless and until their wrongful conduct is enjoined, Plaintiff and Class members will continue to suffer immediate and irreparable injury for which they are without an adequate remedy at law. Plaintiff and Class members, therefore, are also entitled to an injunction against Manufacturer Defendants preventing and restraining further antitrust violations, under Section 16 of the Clayton Act, 15 U.S.C. § 26.

## COUNT TWO
## VIOLATION OF § 2 OF THE SHERMAN ACT (15 U.S.C. § 2) – MONOPOLIZATION
### (Against Syngenta)

198.    The preceding factual statements and allegations are incorporated by reference.

199.    The relevant product markets are the markets for EPA-registered CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, and s-METOLACHLOR. The relevant geographic market is the United States.

200.    As a result of the scheme alleged herein, Syngenta possesses monopoly power in each of these markets.

201.    By means of the CPP loyalty program scheme and conspiracy, under which it made large payments to its Co-Conspirator Distributors and Retailers for their above-described cooperation, Syngenta willfully maintained its monopoly power in such markets even after its patent and regulatory exclusivities expired.

202.    Syngenta's actions were carried out willfully and with the specific intent to maintain its monopoly power in such CPP markets through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

203.    The direct, foreseeable, and proximate result of Syngenta's anticompetitive conduct was increased prices and harm to competition in such CPP markets.

204.    There is no legitimate pro-competitive justification for Syngenta's anticompetitive conduct, and even if there were, there are less restrictive alternatives to achieve them.

205.    As a direct, material, and proximate result of Syngenta's violation of § 2 of the Sherman Act, Plaintiff and Class members have suffered (and will continue to suffer) injury and harm to their business and property within the meaning of § 4 of the Clayton Act. As such, Plaintiff and Class members are entitled to treble damages for Syngenta's violations of § 2 of the Sherman Act under § 4 of the Clayton Act.

206.    Syngenta's unlawful anticompetitive conduct continues and, unless restrained, will continue. Unless and until its wrongful conduct is enjoined, Plaintiff and Class members will continue to suffer immediate and irreparable injury for which they are without an adequate remedy

at law. Plaintiff and Class members, therefore, are also entitled to an injunction against Corteva preventing and restraining further antitrust violations, under § 16 of the Clayton Act.

## COUNT THREE
## VIOLATION OF § 2 OF THE SHERMAN ACT (15 U.S.C. § 2) – MONOPOLIZATION
## (Against Corteva)

207.    The preceding factual statements and allegations are incorporated by reference.

208.    The relevant product markets are the markets for EPA-registered CPPs containing RIMSULFURON and OXAMYL. The relevant geographic market is the United States.

209.    As a direct and/or proximate result of the alleged CPP loyalty program scheme and conspiracy, Corteva possesses monopoly power in the markets for EPP-registered CPPs containing RIMSULFURON and OXAMYL for sale in the United States.

210.    By means of the CPP loyalty program scheme and conspiracy, under which it made large payments to its Co-Conspirator Distributors and Retailers for their above-described cooperation, Corteva willfully maintained its monopoly power in such markets even after its patent and regulatory exclusivities expired.

211.    Corteva's actions were carried out willfully and with the specific intent to maintain its monopoly power in such CPP markets through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

212.    The direct, foreseeable, and proximate result of Corteva's anticompetitive conduct was increased prices and harm to competition in such CPP markets.

213.    There is no legitimate pro-competitive justification for Corteva's anticompetitive conduct, and even if there were, there are less restrictive alternatives to achieve them.

214.    As a direct, material, and proximate result of Corteva's violation of § 2 of the Sherman Act, Plaintiff and Class members have suffered (and will continue to suffer) injury and harm to their business and property within the meaning of § 4 of the Clayton Act. As such, Plaintiff and

Class members are entitled to treble damages for Corteva's violations of § 2 of the Sherman Act under § 4 of the Clayton Act.

215.    Corteva's unlawful anticompetitive conduct continues and, unless restrained, will continue. Unless and until its wrongful conduct is enjoined, Plaintiff and Class members will continue to suffer immediate and irreparable injury for which they are without an adequate remedy at law. Plaintiff and Class members, therefore, are also entitled to an injunction against Corteva preventing and restraining further antitrust violations, under § 16 of the Clayton Act.

## RELIEF REQUESTED

WHEREFORE, Plaintiff, on behalf of itself and the proposed Classes, prays for judgment against all Defendants, jointly and severally, as follows:

    a.    That the Court certify the Class, appoint Plaintiff as the class representative, and his counsel as Class Counsel;

    b.    That the Court enter judgment for Plaintiff and the proposed Class against all Defendants, jointly and severally;

    c.    That the Court grant Plaintiff his request for injunctive relief against all Defendants;

    d.    That Plaintiff and the Class be awarded treble damages;

    e.    That Plaintiff be awarded reasonable attorneys' fees and costs; and

    f.    That Plaintiff be granted such other and further relief as the Court may deem just and reasonable.

## JURY TRIAL DEMANDED

Pursuant to FED. R. CIV. P. 38(b), Plaintiff demands a trial by jury of all issues so triable.

Date: February 1, 2023

By: */s/ William N. Riley*
William N. Riley, Atty. No. 14941-49
Russell B. Cate, Atty. No. 27056-29
RILEYCATE, LLC
11 Municipal Drive, Suite 320
Fishers, IN 46038
Telephone: 317.597.6179
wriley@rileycate.com
rcate@rileycate.com

Elizabeth A. Fegan *(pro hac vice forthcoming)*
Megan E. Shannon *(pro hac vice forthcoming)*
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Tel: 312.741.1019
Facsimile: 312.264.0100
beth@feganscott.com
megan@feganscott.com

**Counsel for Plaintiff and the Putative Class**